¶ 1.
DANIEL KELLY, J.
The question before the court is whether the City of Madison (the "City"), *550 through its Transit and Parking Commission (the "Commission"), may prohibit passengers from bearing weapons on the buses it operates as "Metro Transit."[1]
I. BACKGROUND
¶ 2. The Commission adopted a rule on July 12, 2005, to address the conduct of passengers using Metro Transit's public transportation services (the "Rule").[2] The Rule identifies several types of unacceptable conduct, any one of which subjects the offending individual to potential expulsion from city buses. As relevant here, the Rule says:
The following conduct is prohibited in all Metro facilities, including but not limited to, buses .... Any individual observed engaging in the conduct may be told by a Bus Operator or Supervisor or other authorized individual to leave the facilities immediately and may be subject to arrest by proper authorities [:]
[[Image here]]
*551 • Bringing any items of a dangerous nature on-board buses including: weapons (pistols, rifles, knives or swords). .. .[3]
¶ 3. Petitioners, Wisconsin Carry, Inc. and Thomas Waltz ("Wisconsin Carry"), contacted Metro Transit[4] and asked that it amend the Rule to harmonize it with 2011 Wisconsin Act 35 ("Act 35"), which (amongst other things) authorized Wisconsin residents to carry concealed weapons upon obtaining the required license. Wisconsin Carry also asserted that Wis. Stat. § 66.0409 (2013-14)[5] deprived the City of its erstwhile authority to enforce the Rule's prohibition of weapons on the City's buses. This statute, which imposes restrictions on certain local regulations, states that:
Except as provided in subs. (3) and (4), no political subdivision may enact or enforce an ordinance or adopt a resolution that regulates the.. . possession, bearing, [or] transportation... of any knife or any firearm . . . unless the ordinance or resolution is the same as or similar to, and no more stringent than, a state statute.
Wis. Stat. § 66.0409(2) .[6] We will refer to this statute as the "Local Regulation Statute".
¶ 4. Metro Transit declined Wisconsin Carry's invitation to amend the Rule. Wisconsin Carry subse *552 quently filed a complaint[7] seeking a declaration that the City of Madison's authority to enforce the Rule has been preempted by state law. The City moved to dismiss, arguing that the complaint failed to state a claim upon which relief could be granted. Petitioners filed an amended complaint that, as relevant here, identified Madison, Wis., Gen. Ordinances § 3.14(4)(h), as the legislation offending the Local Regulation Statute.
¶ 5. That ordinance created the City's Department of Transportation, as well as the Commission. It charges the Commission with the responsibility to
develop and recommend to the Common Council policies on the various elements of transit and parking and transit and parking facilities for the purpose of providing for the safe, efficient and economical movement of persons and goods in the City of Madison and the metropolitan area consistent with the Commission's mission to support the City's distinct and quality neighborhoods where people will want to live, work, do business, learn and play by providing comfortable, safe and efficient transportation.
Madison, Wis., Gen. Ordinances § 3.14(4)(g) (2007) (the "Ordinance"). In pursuit of those ends, the Ordinance empowers the Commission to adopt certain written requirements:
To accomplish these objectives the Transit and Parking Commission shall adopt and publish in writing standards, warrants, objectives and criteria for transit, parking and paratransit operations, services and *553 facilities in order that such operations, services and facilities function as an integrated and coordinated part of the overall adopted transportation policy.
Id. It may also establish rules and procedures as necessary to implement its duties: "The Transit and Parking Commission shall be empowered to establish such rules and procedures as may be necessary to carry out the purpose and provisions of this ordinance." Id., § 3.14(4)(h).
¶ 6. After Wisconsin Carry filed its amended complaint, the City renewed its motion to dismiss, which the circuit court[8] granted. Wisconsin Carry appealed and the court of appeals, in a published opinion, affirmed. We granted Wisconsin Carry's petition for review, and now reverse.
II. STANDARD OF REVIEW
¶ 7. A motion to dismiss tests the legal sufficiency of a complaint, which a court will grant only if there are no conditions under which a plaintiff may recover. Kaloti Enters., Inc. v. Kellogg Sales Co., 2005 WI 111, ¶ 11, 283 Wis. 2d 555, 699 N.W.2d 205. Such a motion requires a court to accept all of the complaint's factual assertions as true, along with the reasonable inferences one may take from them. Id. Resolving a motion to dismiss, therefore, involves only a question of law. John Doe 1 v. Archdiocese of Milwaukee, 2007 WI 95, ¶ 12, 303 Wis. 2d 34, 734 N.W.2d 827. We review questions of law de novo; we do not defer to the circuit court or the court of appeals, but we benefit from their analyses. State v. Popenhagen, 2008 WI 55, ¶ 32, 309 Wis. 2d 601, 749 N.W.2d 611.
*554 III. ANALYSIS
A. Constitutional Background
¶ 8. Wisconsin Carry claims the Rule abridges the right to possess weapons on the City's buses,[9] so we will begin our analysis with a brief rehearsal of the nature of the right at issue.[10] The United States Constitution commands that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const, amend. II. More recently (less than twenty years ago, in fact), the people of Wisconsin enshrined the protection of this right in our own constitution: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose." Wis. Const. art. I, § 25.
¶ 9. This is a species of right we denominate as "fundamental," reflecting our understanding that it finds its protection, but not its source, in our constitutions.[11] The right's existence precedes, and is independent of, such documents. Bearing arms "is not a right *555 granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." United States v. Cruikshank, 92 U.S. 542, 553 (1875); see also District of Columbia v. Heller, 554 U.S. 570, 592 (2008) ("|I]t has always been widely understood that the Second Amendment, like the First and Fourth Aanendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed ....'").
f 10. Whether the Second Amendment protects this right only when corporately exercised in the context of a militia, as opposed to a person exercising it individually, has been a source of contention. That question, however, received an authoritative answer in Heller. After extensive textual and historical analysis, the Supreme Court concluded that the purpose of the amendment is to "guarantee the individual right to possess and carry weapons in case of confrontation." Heller, 544 U.S. at 592 (emphasis added). Wisconsin's protection of this right does not contain the grammatical and linguistic oddities that necessitated Heller's *556 exhaustive treatment of the question. It is, instead, a straightforward declaration of an individual right to keep and bear arms for any lawful purpose.
¶ 11. One way in which people in Wisconsin may exercise this individual right is by obtaining a license to carry concealed weapons. The genesis of this opportunity was Act 35, now codified (in part) as Wis. Stat. § 175.60. Upon obtaining such a license, the "licensee or . . . out-of-state licensee may carry a concealed weapon[12] anywhere in this state except as provided under subs. (15m) and (16) and ss. 943.13(1m)(c) and 948.605(2)(b)1r." Wis. Stat. § 175.60(2g) . We will refer to this statute as the "Concealed-Carry Statute".
¶ 12. Act 35 also eliminated the prohibition against carrying a loaded handgun in a vehicle. The statutory provision governing the interaction between weapons and vehicles now says: "Except as provided in sub. (4), no person may place, possess, or transport a firearm ... in or on a vehicle, unless one of the following applies: 1. The firearm is unloaded or is a handgun." Wis. Stat. § 167.31(2)(b) . We will refer to this statute as the "Vehicle Statute." A "firearm" is "a weapon that acts by force of gunpowder." Wis. Stat. § 167.31(1)(c) . For the purpose of this statute, "vehicle" means "every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, except railroad trains." Wis. Stat. §§ 167.31(1)(h) , 340.01(74) .
¶ 13. With that brief refresher, we turn now to the Rule.
*557 B. Effect of the Local Regulation Statute
¶ 14. Wisconsin Carry tells us that the City's Common Council, and all of its subordinate entities, may regulate the possession, bearing, and transportation of arms only to the extent allowed by the Local Regulation Statute. One of the key limitations imposed by that statute, they say, is that regulations on this subject may be no more stringent than analogous state statutes. They argue that, inasmuch as the Rule entirely forbids the possession, bearing, and transportation of arms on city buses, the City may no longer enforce it because there is no state statute so stringent.
¶ 15. The City responds that the Local Regulation Statute has nothing to say about the Rule. First, it asserts that the Rule is no more stringent than state statutes. Additionally, because it owns the buses, the City says it may keep them weapon-free just as readily as a private individual may prohibit weapons in his own vehicle. Second, even if it were more stringent than state statutes, the City says the Local Regulation Statute's plain terms express the legislature's decision to leave municipal regulations like the Rule alone. The statute applies only to "political subdivisions," which (according to the internal definitions) comprise only cities, villages, towns and counties. Wis. Stat. § 66.0409(l)(b) . The Commission is none of those and so, according to the City, it is unencumbered by the statute.[13] Further, the statute's strictures apply to a political subdivision's "ordinances" and "resolutions." Wis. Stat. § 66.0409(2). The City says a "rule" is *558 different from ordinances and resolutions, and therefore lies beyond the statute's reach.
¶ 16. Resolving this case will therefore require that we determine whether the Local Regulation Statute applies to the Commission and the rules it adopts, and (if so) whether the Rule is impermissibly more stringent than analogous state statutes.[14] We must also compare the Rule to the Concealed-Carry Statute to determine whether the latter preempts the former.
1. Applicability to the Commission
f 17. We will begin with whether the Local Regulation Statute affects rules adopted by the Commission. If it does not, there is no need to determine whether the Rule is more stringent than a state statute.
¶ 18. With its frequent reference to the "plain text" of the Local Regulation Statute, the City urges us (,sotto voce, to be sure) to engage the "plain meaning" rule as we consider the statute's relationship to the Commission and its Rule. This axiom, which is the bedrock of the judiciary's methodology, says that " [i]f the plain meaning of the statute is clear, a court need not look to rules of statutory construction or other extrinsic aids. Instead, a court should simply apply the clear meaning of the statute to the facts before it." UFE Inc. v. Labor and Indus. Review Comm'n, 201 Wis. 2d 274, 281-82, 548 N.W.2d 57 (1996) (citation omitted).
*559 ¶ 19. We must, however, keep in mind that this axiom does not reduce the judicial function to mechanically comparing the words of a statute to the name given a legislative enactment, or the body enacting it. We are not merely arbiters of word choice. If we were, we would need do nothing more than confirm that "rule" is a word different from "ordinance" and "resolution," and that "commission" is etymologically distinct from "city," "village," "town," and "county."
¶ 20. It is, instead, the "plain meaning" of a statute we must apply. We find that meaning in the statute's text, context, and structure: "[Statutory interpretation 'begins with the language of the statute.' . . . [It] is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes ...." State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶¶ 45-46, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting Seider v. O'Connell, 2000 WI 76, ¶ 43, 236 Wis. 2d 211, 612 N.W.2d 659). We examine the statute's contextualized words, put them into operation, and observe the results to ensure we do not arrive at an unreasonable or absurd conclusion. Id., ¶ 46 ("[Statutory language is interpreted . . . reasonably, to avoid absurd or unreasonable results.").[15] Here, the process requires us to survey how a city's legislative authority is affected by a statute forbidding it from *560 enacting or enforcing an ordinance or resolution on a given subject. If a city's governing body thereby loses authority to legislate on that subject, we must then consider whether a city's sub-unit can nonetheless legislate on that subject when authority is denied to the governing body itself.
a. Municipal Authority
¶ 21. It is true, and ever has been, that cities exercise only such authority as they receive from our constitution and statutes. "[C]ities are creatures of the state legislature that have no inherent right of self-government beyond the powers expressly granted to them." Black v. City of Milwaukee, 2016 WI 47, ¶ 23, 369 Wis. 2d 272, 882 N.W.2d 333 (quoting Madison Teachers, Inc. v. Walker, 2014 WI 99, ¶ 89, 358 Wis. 2d 1, 851 N.W.2d 337 (citing Van Gilder v. City of Madison, 222 Wis. 58, 72-73, 267 N.W. 25 (1936) (citing City of Trenton v. New Jersey, 262 U.S. 182, 187 (1923)))) (internal quotation marks omitted). And if a statute may confer authority on a city, a statute may take it away. City of Trenton, 262 U.S. at 187 ("A municipality is merely a department of the state, and the state may withhold, grant, or withdraw power and privileges as it sees fit.").
¶ 22. One necessary corollary to this principle is that a city may not create authority ex nihilo, either for itself or its divisions. Were it otherwise, the ability of a constitution and legislature to control a city's quantum of authority would come to naught—upon the loss of some measure of authority, an enterprising city could simply declare it reinstated. But this is not part of a *561 city's remit, and so there is no mechanism by which it may regain withdrawn authority but by legislative decree or constitutional amendment.
¶ 23. In light of these principles, we must determine what the Local Regulation Statute means when it says "no political subdivision may enact or enforce an ordinance or adopt a resolution that regulates the . . . possession, bearing, [or] transportation ... of any knife or any firearm . . . ." Wis. Stat. § 66.0409(2). The City acknowledges that this provision eliminates the common council's authority to enact or enforce an ordinance or resolution on the identified subject (unless it falls within the saving clause). Therefore, the question (at this stage of the analysis) is whether ordinances and resolutions comprise a municipal governing body's complete legislative authority. If they do, then losing the ability to adopt an ordinance or resolution on a particular subject represents the complete withdrawal of authority to legislate on that subject. And if the City has no legislative authority with respect to that subject, it necessarily has nothing to delegate to its divisions.[16]
¶ 24. With respect to the nature of ordinances and resolutions, the City directs our attention to Cross v. Soderbeck, 94 Wis. 2d 331, 288 N.W.2d 779 (1980). There, we said:
*562 A municipal ordinance or by-law is a regulation of a general, permanent nature, enacted by the governing council of a municipal corporation. ... A resolution, or order as it is sometimes called, is an informal enactment of a temporary nature, providing for the disposition of a particular piece of administrative business of a municipal corporation... . And it has been held that even where the statute or municipal charter requires the municipality to act by ordinance, if a resolution is passed in the manner and with the statutory formality required in the enactment of an ordinance, it will be binding and effective as an ordinance.
Id. at 342 (citing Wis. Gas & Elec. Co. v. City of Ft. Atkinson, 193 Wis. 232, 243-44, 213 N.W. 873 (quoting 19 Ruling Case Law 895, § 194 (1917)) (internal quotation marks omitted)).
¶ 25. From this we may derive three principles useful to our inquiry. First, ordinances are municipal legislative devices, formally enacted, that address general subjects in a permanent fashion. Second, resolutions are those informal municipal legislative acts that address particular pieces of administrative business in a temporary fashion. And third, the label given to a legislative device is not dispositive—one identifies the device's taxonomy functionally.
¶ 26. The scope of legislative activity covered by ordinances and resolutions, therefore, extends to formal and informal enactments that address matters both general and specific, in a manner meant to be either temporary or permanent, and which can be characterized as administrative or otherwise. And we will treat a municipality's legislative device as an *563 ordinance or resolution, regardless of how it may be denominated, so long as it functions within the scope of this definition.[17]
¶ 27. It is apparent from this that there is no legislative action a municipality could take, either in form or function, that would not come within the ambit of "ordinance" or "resolution." Consequently, if a statute removes the authority of a municipality's governing body to adopt an ordinance or resolution on a particular subject, the governing body loses all legislative authority on that subject.
¶ 28. Thus, the plain meaning of the Local Regulation Statute is that the legislature withdrew from the City's governing body all authority to legislate on the subjects it identifies, including the "possession, bearing, [or] transportation... of any knife or any *564 firearm" unless the legislation is "the same as or similar to, and no more stringent than, a state statute." Wis. Stat. § 66.0409(2) . Because a municipality cannot delegate what it does not have, the City is entirely powerless to authorize any of its sub-units to legislate on this subject.[18]
¶ 29. The City notes, and properly so, that it has no ordinance addressing, in explicit terms, the possession, bearing, or transportation of knives or firearms. In the absence of such an ordinance, the City says there is nothing on which the Local Regulation Statute may operate.
¶ 30. But the City itself necessarily identifies the Ordinance as the legislation that authorizes the regulation of firearms. This is so because the City must appeal to it for the Rule's efficacy. Unless the Commission has some source of authority independent of the City, its authority to adopt the Rule must flow from the City to the Commission through the Ordinance. By claiming the Rule is authoritative, the City is itself telling us that the Ordinance contains a firearms-regulating grant of authority. And that is how the Ordinance comes within the Local Regulation Statute's purview.
¶ 31. Put another way, the City may not simultaneously maintain that the Commission has the authority to regulate firearms while denying that any of its ordinances authorize the regulation of firearms. Cities may, and often do, delegate authority to their sub-units without explicitly describing each and every subject the sub-unit may address. The broader the grant of authority, the more general the language. That is true here— the Ordinance is a very generalized grant of authority to the Commission to address mass transit issues.
*565 ¶ 32. But the generalization does not mean the grant of authority to regulate firearms is not there; it just means it is not explicit. It is the Ordinance's implicit grant of firearm-regulating authority on which the Local Regulation Statute performs its work. And that work consists of restricting the Ordinance's grant of firearm-regulating authority. So, if the Commission has the authority to regulate firearms more stringently than state statutes, it must find the source of that authority somewhere other than the City.
b. Potential Alternative Sources of Commission Authority
f 33. To discover the full scope of the Commission's authority, we must determine what manner of entity it is, and whether it draws regulatory authority from some source other than the City. The City's ordinances say a "commission" is "a Sub-unit of the City." Madison, Wis., Gen. Ordinances § 33.01(3)(c). The City creates "standing" sub-units (which are those meant to exist permanently) by ordinance. See id. § 33.01(3)(e) & (4)(b). The Ordinance makes the Commission a standing sub-unit.
¶ 34. The Ordinance provides that the Commission is a public utility within the meaning of Wis. Stat. § 66.0805 . This statute grants municipalities the authority to create commissions to govern public utilities, but it contains no independent grant of authority to such commissions.[19] As a public utility, the Commission exercises its authority under the supervision of *566 the City: "The board of commissioners, under the general control and supervision of the governing body, shall be responsible for the entire management of and shall supervise the operation of the utility." Wis. Stat. § 66.0805 (1). The City exercises its supervisory authority via ordinance: "The governing body shall exercise general control and supervision of the commission by enacting ordinances governing the commission's operation." Id.
¶ 35. The Ordinance says the Commission is also a transit commission within the meaning of Wis. Stat. § 66.1021 . This section grants municipalities the authority to create transportation systems as well as commissions to govern them: "A city . . . may enact an ordinance for the establishment, maintenance and operation of a comprehensive unified local transportation system .... 'Transit commission' or 'commission' means the local transit commission created under this section." Wis. Stat. § 66.1021(1), (3)(b). The statute does not directly grant the Commission any authority, but it does identify some of the authority the Commission must be furnished by the municipality's enacting ordinance,[20] none of which is at issue here.
¶ 36. The Ordinance contains its own description of the authority the Commission is to exercise. So, for example, it has the authority to recommend transit-related policies to the common council for its consideration: "The Transit and Parking Commission shall make recommendations to the Common Council regarding policies on all transit and parking matters . . . ." Madison, Wis., Gen. Ordinances § 3.14(4)(a); see also id. § 3.14(4)(g) ("It shall be the general duty of *567 the Transit and Parking Commission to develop, and recommend to the Common Council policies on the various elements of transit and parking and transit and parking facilities for the purpose of providing for the safe, efficient and economical movement of persons and goods in the City of Madison and the metropolitan area . . . .").
¶ 37. Finally, the Commission may adopt "standards, warrants, objectives and criteria for transit, parking and paratransit operations" pursuant to its authority under the Ordinance. Id. It may also establish rules and procedures as necessary to implement its duties. Id. § 3.14(4)(h). With respect to transit, the Commission's duty is to "provide overall management, operation and control of the assets of the City of Madison transit and paratransit transportation system to ensure that it functions as an integrated part of the overall transportation system." Id. § 3.14(4)(h)2.
¶ 38. The City has not identified, and we have not found, any authority for the Commission's existence apart from what we just described. It is apparent from these provisions that the Commission is entirely a creature of the City and exercises only that amount and type of authority it receives from the City. The Ordinance, by its express terms, created the Commission and infused it with enumerated responsibilities.[21] Although the statutes relating to public utilities and transit commissions describe certain attributes the governing commissions must have, they do not, by their own force, call the Commission into existence or endow it with authority independent of what they confer on the City. Instead, they simply grant munici *568 palities the authority to create the commissions in the manner and with the attributes the statutes prescribe.
f 39. The Commission has no authority but for what it received from the City, and the City has no authority to legislate contrary to the boundaries established by the Local Regulation Statute. This means that if the Rule is more stringent than a state statute, then to that extent the City no longer has authority to enforce it.
c. Purpose of the Local Regulation Statute
¶ 40. Before we measure the Rule's stringency, we pause to address the City's argument that this result would frustrate the statute's purpose.[22] The City speculates that the legislature wished to limit a city's authority to regulate firearms, but only when the city's governing body acts qua governing body. It says the statute's plain reference to only ordinances and resolutions demonstrates that the legislature intended to leave intact a municipal sub-unit's authority to regulate firearms.[23]
*569 ¶ 41. In the City's reading of the statute, the legislature made a conscious decision to withdraw firearms-regulating authority from a municipality's democratically-accountable governing body, while leaving that authority entirely undiminished when exercised by the municipality's democratically-itnaccountable sub-units.[24] The only explanation offered for why the legislature would trust firearms-regulating authority to a municipal sub-unit, but not the governing body to which it owes its existence and power, is that the latter's legislative authority is broader than that of the former. The implication is that municipalities are eager to impose aggressive firearms regulations, and that impulse must be curbed by *570 ensuring that any such regulations could be adopted only piecemeal, within the limited portfolio of each democratically-unaccountable sub-unit.
¶ 42. But if the City's speculation is correct, if the legislature really did adopt the Local Regulation Statute to restrict the scope of any given municipal firearms regulation, it chose a singularly ineffective means of doing so. It does not require mastery of three-dimensional chess, nor even checkers, to devise a strategy for defeating such an objective.
¶ 43. Deprived of native authority to regulate firearms, a city might simply create a "public-safety commission" with a mandate to secure the public's well-being in all publicly-accessible spaces. The enabling ordinance would make no specific reference to firearms, so (under the City's theory) it would escape the Local Regulation Statute's attention. The public-safety commission would then adopt the same citywide firearms regulation the city's governing body could not itself adopt. The scope of the resulting regulation would not have suffered the least restriction by virtue of the Local Regulation Statute. Alternatively, a municipality bent on adopting comprehensive firearms regulations could simply create a number of limited-portfolio sub-units whose cumulative scope of authority would equal that of the municipality. The sub-units could then adopt firearms regulations that would differ in no meaningful way from a single regulation adopted by the municipality's governing body. Functionally, this imputed purpose would leave the statute with neither meaning nor effect.
¶ 44. In light of these obvious workarounds, we are unwilling to join the City's speculation that the legislature chose to entrust firearms-regulating authority to municipal sub-units, but not their *571 democratically-accountable progenitors.[25] If the legislature actually intended such an easily thwarted purpose, it gave us no textual clues by which to discern it.
¶ 45. Finally, the City asserts that if the legislature had intended to include "rules" in the realm of prohibited legislative acts, it would have said so. It observes that other states, when they restricted local firearms regulations, listed other types of legislative devices in their prohibitions. For instance, it notes that Idaho's statute applies to "any law, rule, regulation, or ordinance." Idaho Code Ann. § 18-3302J (2016).[26] And Florida's statute refers not just to ordinances, but also administrative regulations and rules. Fla. Stat. Ann. § 790.33 (West 2007 & Supp. 2016).[27] And Kansas's *572 statute covers "administrative actions." Kan. Stat. Ann. § 12-16,124 (Supp. 2015).[28] And so on. But if the label of a legislative act is dispositive, then Idaho's local communities are vulnerable to local "policies" regulating firearms, Florida would presumably allow "resolutions" restricting firearms, and Kansas (apparently) is willing to countenance local regulations in the form of an "ordinance." Here in Wisconsin, the legislature would need to be even more cognizant of the labels a municipality might attach to its legislation: The Ordinance, for example, authorizes the Commission to adopt, amongst other things, rules, procedures, standards, warrants, and objectives.
¶ 46. Accepting the City's argument would require the legislature to list every possible label for a legislative act before we could conclude that its intention was to withdraw from a municipality the authority to regulate a particular subject. And it would further require that the legislature amend the statute every time a municipality conceived of a new label for its legislative acts. But this is law-making as comedy, *573 with a hapless legislature chasing about a wily municipality as it first enacts an ordinance on a forbidden subject, and then a policy, then a rule, then a standard, and on and on until one of them wearies of the pursuit or the other exhausts the thesaurus.[29] The City advocated its interests in a competent and professional manner, so we are confident it does not really intend that we understand the legislative process in this fashion.[30] Thus, in the absence of any discernible reason to do so, we will not.[31]
*574 2. Stringency
¶ 47. Because we conclude that the City—acting either through its governing body or sub-units—has no authority to "regulate [] the . . . possession, bearing, [or] transportation ... of any knife or any firearm . . . unless the ordinance or resolution is the same as or similar to, and no more stringent than, a state statute,"[32] we must now determine whether the Rule satisfies the stringency standard.[33] It is the City's prerogative to choose the legislation against which we will compare the Rule (at least initially), and it has chosen the Vehicle Statute.
¶ 48. The Vehicle Statute governs the safe use and transportation of firearms. The specific portion of the statute the City recommends for our consideration prohibits the placing, possession, or transportation of a firearm in a vehicle unless it is unloaded or a handgun. Wis. Stat. § 167.31(2)(b)1. That is to say, the Vehicle Statute allows a person to carry a loaded handgun, or an unloaded firearm of a different type, in a vehicle. A vehicle (for purposes of this statute) includes "every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, except railroad trains," as well as snowmobiles, all-terrain vehicles and electric personal assistive mobility devices. Id. §§ 167.31(1)(h), 340.01(74). We trust it is beyond cavil that a bus is a vehicle within the scope of this definition.
*575 ¶ 49. So in choosing the Vehicle Statute for comparison, the City asserts that a total ban on carrying any firearm on a bus is no more stringent than a statute that bans only loaded non-handguns on a bus. These provisions occupy almost perfect legislative antipodes. Unless the City has a method by which it can explain how the distance between the two is more apparent than real, we must conclude the Rule is impermissibly more stringent than the Vehicle Statute.
¶ 50. The City says it can harmonize the Vehicle Statute and the Rule by observing that the former allows an individual to carry a firearm only in "a" vehicle, not "any" vehicle or "all" vehicles. The City does not explain what difference it would make if the legislature had chosen "any" or "all" instead of "a." Instead, it skips almost immediately to the conclusion that the legislature's word choice created maneuvering room for restrictive municipal firearms regulations. There is no readily-apparent principle that would link the City's proposition to its conclusion, and we will not further explore this argument when the City has chosen to remain silent.[34]
¶ 51. The City also says it can harmonize the two provisions because the Vehicle Statute does not say a person must carry a firearm on a bus. It is true the Vehicle Statute is prohibitory (as the City pointed out), and it is also true that an exception from a prohibition *576 is not the same thing as a mandate. This means that although the Vehicle Statute does not prohibit a person from carrying a firearm in a vehicle (except as described above), it also does not require a person to carry such a weapon in a vehicle. But this can give the City no succor. The City bans the carrying of all firearms on its buses. So its burden is not to find a statute that neither bans nor requires carrying firearms, its burden is to identify a statute that does ban, and does so at least as restrictively as the Rule. As relevant here, the Vehicle Statute prohibits only the carrying of loaded non-handguns in a vehicle. Consequently, the Vehicle Statute justifies the Rule only in that regard. By also banning the carrying of knives, handguns (whether loaded or not), and unloaded non-handguns, the Rule is dramatically more restrictive than the Vehicle Statute.
f 52. The City also says the Rule is no more restrictive than Wisconsin's Statutes because, as owner of its buses, it has the same authority to ban the carrying of weapons as individuals have in banning weapons from their private vehicles. There are two reasons this cannot justify the Rule. The first, and most obvious, is that an individual's right to ban weapons from his vehicle is not statutory, and so cannot serve as the point of comparison. He may keep weapons from his vehicle because he has the right to exclude others from his property. He needs no statutory grant, and he has received none; his authority is incident to his property right in the vehicle. He can keep weapons out of his car because he can deny a person entry for any reason he may choose.[35] So if he does not want weapons in his *577 vehicle, he may simply deny the person carriage unless he first divests himself of his weapons. Thus, there is no sense in which the Rule can be described as "the same as or similar to, and no more stringent than, a state statute.”[36]
¶ 53. Second, the City's ownership rights in its buses are not the same as an individual's ownership rights in his private vehicle. It is possible the City means its argument to assert that the Local Regulation Statute's reference to "a state statute" as the point of comparison is meant to be longhand for "law," thereby giving us leave to compare the Rule's stringency against non-statutory sources of law. If that is what the reference means—and we do not believe it is—the City would still be unable to justify the Rule. The City's argument is dependent on demonstrating that its authority to exclude passengers from its buses is coextensive with an individual's authority to deny carriage to another. For the following reasons, it is not.
¶ 54. Governments, whether great or small, exercise only that amount of authority they rightfully receive from those they represent.[37] And they must use *578 that authority only in ways that are appropriate to achieve the ends for which they were granted the authority.[38]
¶ 55. With respect to property entrusted to its care, the City notes that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Adderley v. Florida, 385 U.S. 39, 47 (1966). The City lawfully dedicated its buses to *579 providing "safe, efficient and economical movement of persons and goods in the City of Madison and the metropolitan area consistent with the Commission's mission to support the City's distinct and quality neighborhoods where people will want to live, work, do business, learn and play by providing safe and efficient transportation." Madison, Wis., Gen. Ordinances § 3.14(4)(g). Thus, the City says, Adderley gives it authority to exercise over its buses the rights typical of private ownership in pursuit of those enumerated purposes. So we must determine whether Adderley allows the City to pursue these purposes by banning weapons on the same basis that a private individual bans weapons from his private vehicle. We conclude it does not.
¶ 56. An individual may ban weapons because he has unlimited discretion to bar anyone and everyone from his vehicle for any reason, or even no reason at all. The City enjoys no such latitude with respect to bus passengers. Indeed, the City's ability to exclude passengers is subject to significant circumscription. The most significant is that, whatever property rights it might have, it may not use them in derogation of the law: "[A] municipality cannot lawfully forbid what the legislature has expressly licensed, authorized or required, or authorize what the legislature has expressly forbidden." Fox v. City of Racine, 225 Wis. 542, 545, 275 N.W. 513 (1937).
¶ 57. Adderley is entirely incapable of pushing that principle aside. Adderley is a First Amendment case (as are the other cases the City cited in support of its "ownership" argument), in which the Court analogized public ownership of property to private ownership as an aid in determining whether the property in *580 question constituted a public forum for speech purposes. This case, of course, has nothing to do with the First Amendment. Thus, the City's argument on this point consists entirely of an analogy to free speech cases, the foremost of which (Adderley) tangentially employed an analogy between public and private ownership as part of a much broader constitutional analysis.[39] Analogies are sometimes helpful in contextualizing an issue, but an analogy on top of an analogy rarely conveys useful information. Such is the case here.
¶ 58. Adderley can teach us nothing about the question at hand because the City's recursive analogies left no room for the Local Regulation Statute. To conclude that the City's property rights allow it to exclude law-abiding members of the public from its buses, we would first have to conclude that those property rights enjoy a permanence so profound that they are immune from statutory alteration. Those analogized rights, however, are not untouchable. The scope and nature of property rights are defined by our laws.[40] If the law modifies a property right, therefore, *581 one may not assert the previous version of the property right to trump the very law that changed the right. The Local Regulation Statute (as discussed above) forbids the City from forbidding weapons on its buses when otherwise carried in conformance with the law. Thus, to the extent the City previously had a property-based right to exclude riders in possession of weapons, that right ceased with the advent of the Local Regulation Statute. To claim a property right to exclude weapons-carrying passengers from its buses is to invoke a right that no longer exists (if it ever did).
¶ 59. From all of this we may deduce that the City's ownership interest in its buses does not allow it to arbitrarily exclude potential passengers a la private vehicle owners. Instead, any decision to exclude must be tied to a lawful basis. With respect to a prospective passenger who is complying with the Vehicle Statute, state law offers no such basis. And the Local Regulation Statute says the City (and its sub-units) may not create such a basis. Because the City cannot exclude passengers from its buses without a lawful basis, and none exists with respect to passengers who comply with state weapons laws, the City's ownership interest in its buses gives it no authority to promulgate or enforce the Rule.
3. The Concealed-Carry Statute
¶ 60. Thus far we have considered only the Local Regulation Statute's impact on the Rule's proscription of "knives" and "firearms" on the City's buses. We *582 addressed only those weapons in that analysis because those are the types of weapons included in the statute's mandate. But there are other types of weapons, and other statutes that speak to their regulation. Amongst these is the Concealed-Carry Statute, which covers not just handguns but electric weapons and billy clubs as well.[41] So we now determine whether the Rule may lawfully prohibit the carrying of these types of concealed weapons.[42]
¶ 61. In relevant part, the Concealed-Carry Statute says a "licensee or an out-of-state licensee may carry a concealed weapon anywhere in this state except as provided under subs. (15m) and (16) and ss. 943.13(1m)(c) and 948.605(2)(b)1r." Wis. Stat. § 175.60(2g)(a). The exceptions need not detain us, because none address buses. So, because we have already concluded that the City cannot regulate firearms more stringently than state statutes, all we must do here is decide whether city buses are mobile negations of "anywhere in this state."
¶ 62. The City's argument did not engage the language of the Concealed-Carry Statute other than to assert that the word "anywhere" cannot really mean anywhere. There are, of course, two limitations on this right to carry concealed weapons in Wisconsin. We find the first in the statute itself, which contains a list of situations and places to which the statute's mandate does not apply.[43] The second lies in the principle that the legislature is aware of the state's existing laws, *583 and that it adopts new legislation against that backdrop, leaving the present law undisturbed except so far as necessary to make room for the new.[44] As significant *584 here, the Concealed-Carry Statute contains no text suggesting that "anywhere" includes a place the licensee has no permission or right to be. That is to say, a concealed-carry license is not a writ authorizing the licensee to force his way into a place he may not lawfully occupy. Thus, when the Concealed-Carry Statute speaks of "anywhere," it refers to anywhere the licensee may lawfully be, exclusive only of the exceptions contained in the statute itself.
¶ 63. Whether the Rule's prohibition of concealed weapons survives enactment of the Concealed-Carry Statute depends on whether the latter has preempted the former. We begin our analysis by recognizing that cities enjoy both constitutional and statutory grants of authority. The Wisconsin Constitution provides that "[cjities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village." Wis. Const, art. XI, § 3. Our legislature describes a city's authority broadly:
Except as elsewhere in the statutes specifically provided, the council shall have the management and control of the city property, finances, highways, navigable waters, and the public service, and shall have power to act for the government and good order of the city, for its commercial benefit, and for the health, safety, and welfare of the public, and may carry out its powers by license, regulation, suppression, borrowing of money, tax levy, appropriation, fine, imprisonment, confiscation, and other necessary or convenient means. *585 The powers hereby conferred shall be in addition to all other grants, and shall be limited only by express language.
Wis. Stat. § 62.11(5).
¶ 64. Consequently, just because a municipal legislative act treats a subject also addressed by the legislature does not mean the former has been preempted: "[M]unicipalities may enact ordinances in the same field and on the same subject covered by state legislation where such ordinances do not conflict with... the state legislation." City of Milwaukee v. Childs Co., 195 Wis. 148, 151, 217 N.W. 703 (1928). We have developed a disjunctive list of considerations that assists us in determining whether a local legislative act must defer to state legislation:
The tests for determining whether such a legislatively intended withdrawal of power which would necessarily nullify the local ordinance has occurred are:
(1) whether the legislature has expressly withdrawn the power of municipalities to act;
(2) whether the ordinance logically conflicts with the state legislation;
(3) whether the ordinance defeats the purpose of the state legislation; or
(4) whether the ordinance goes against the spirit of the state legislation.
Anchor Sav. & Loan Ass'n v. Equal Opportunities Comm'n, 120 Wis. 2d 391, 397, 355 N.W.2d 234 (1984). The Concealed-Carry Statute does not mention local regulation at all, so it does not represent an express withdrawal of a municipality's power to regulate concealed weapons within the meaning of the first Anchor *586 test. The parties have not expounded on the "spirit" of the Concealed-Carry Statute, so there is insufficient information available to us to make the fourth Anchor test instructive. We will, therefore, concentrate on the second and third tests.
¶ 65. The second test inquires into whether the Rule (as an expression of the legislative authority contained in the Ordinance) logically conflicts with the Concealed-Carry Statute. That statute creates a singularly expansive right to carry concealed weapons. It extends to "anywhere in this state" except as described above. It is difficult to imagine a more comprehensive description of where the right may be exercised than "anywhere." But the legislature did not have to create the right in this manner. If its paramount concern was not comprehensiveness, it could have instead provided a list of places in which the right to carry a concealed weapon could be exercised. This would almost necessarily have led to a patchwork "carry" landscape in which one would need a constantly-updated, GPS-enabled smartphone app to determine from instant to instant whether one was complying with the Concealed-Carry Statute.
¶ 66. The logic inherent in the legislature's decision to define the right as all-encompassing, subject only to carefully delimited exceptions, is that the right is meant to extend as far as is not inconsistent with its internally-defined limitations. There is no room in the Concealed-Carry Statute for a municipality to define "anywhere" as something other than the comprehensive expanse it was meant to be. If there were such room, Wisconsin's municipalities could instantly create the patchwork landscape the text of the Concealed-Carry Statute indicates the legislature meant to avoid.
*587 ¶ 67. This analysis also indicates the Rule fails the third Anchor test. The Concealed-Carry Statute's evident purpose is to allow the carrying of concealed weapons as broadly as possible, subject only to limited exceptions identified by the statute itself. This breadth, coupled with the assurance that only the legislature can add new restrictions, allows individuals to move about the entire state with confidence they are not violating the law. If it were otherwise, people traveling the interstate with a concealed weapon might find themselves compliant as they drive through a carry-philic town, only to find themselves law-breakers a moment later as they pass into an adjacent carry-phobic community. In practice, this would mean (for example) that the municipality along the Madison-Milwaukee corridor with the most restrictive weapon regulation would effectively set the concealed-carry standard for everyone traveling between the two cities. This would certainly defeat the Concealed-Carry Statute's purpose in creating a uniform standard for the entire state.[45]
¶ 68. In sum, the City may not enforce the Rule against concealed-carry licensees who are in compliance with the Concealed-Carry Statute.
*588 IV. CONCLUSION
¶ 69. We hold today that the Local Regulation Statute, Wis. Stat. § 66.0409, has withdrawn authority from the City to regulate, either through its governing body or its sub-units (and without regard to the label it affixes to its regulation or manner of regulating), the subjects identified in the Local Regulation Statute in a manner that is more stringent than an analogous state statute. We also hold that the Concealed-Carry Statute, Wis. Stat. § 175.60, preempts the City's authority to restrict a licensee's right to carry concealed weapons on the City's buses so long as the licensee complies with the statute's requirements. Finally, we hold that neither the City nor any of its sub-units or employees may enforce the Rule to the extent it purports to prohibit carrying any knife or firearm (as defined by the Local Regulation Statute) or weapon (as defined by the Concealed-Carry Statute), so long as such carrying is not forbidden by (and is done in compliance with) the Vehicle Statute, Wis. Stat. § 167.30, the Concealed-Carry Statute, and all other statutes that may from time to time become applicable.
By the Court. The The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.
*589 APPENDIX
[[Image here]]
*590 IV. LEVEL II INAPPROPRIATE CONDUCT ON BUSES OR IN OTHER FACILITIES
The following conduct is prohibited in ail Metro facilities, including but not limited to, buses, Transfer Points, park & ride lots, and bus shelters except as specifically limited below. Any individual observed engaging in the conduct may be told by a Bus Operator or Supervisor or other authorized individual to leave the facilities immediately and may be subject to arrest by proper authorities. The Bus Operator is authorized to request police assistance if necessary. These offenses may also subject passenger(s) to the Exclusion Procedure, described In Section VI; further legal action may be taken as applicable and appropriate.
* Smoking on buses. (See Section V below concerning lighting an incendiary device (e.g. match, lighter, or torch).
* Fighting.
* Bringingany items of a dangerous nature on-board buses including: weapons (pistols, rifles, knives or swords); flammable liquids; dangerous, toxic or poisonous substances; vessels containing caustic materials, chemicals, adds or alkalis; fishing rods which are not broken down or have unsecured or exposed hooks or lures, ski poles unless secured to skis or have tip covers; sheet glass and sharp objects. Fencing foils must be sheathed and left at the front of the bus with the bus operator,
« Behavior that is disruptive, harassing, or threatening in nature to Metro passengers or employees. This includes following or stalking passengers or employees.
* Causing sounds that are unreasonable and highly disruptive of other individuals using Metro facilities or services, including but not limited to: prolonged loud,, abusive, indecent, profane or drunken conduct.
<* Misuse of fare media.
* Drinking alcoholic beverages or possessing open containers of alcoholic beverages.
* Otherwise disorderly or inappropriate conduct which is inconsistent with the safe and orderly use of transit facilities for their intended purpose.
V. LEVEL III INAPPROPRIATE CONOUCT/EMERGENCY SITUATIONS
The following conduct in all Metro vehicles and facilities, including buses, Transfer Points, Park and Ride Lots and bus shelters will be cause for police intervention, arrest and/or prosecution. An emergency situation can be defined as any situation in which an individual's actions present an imminent danger to the life or safety of him/herself or others, orto Metro property.The Bus Operator is authorized to request police assistance. An individual found to have engaged in any of the following activities will be excluded from transit facilities and/or services pursuant to the process in Section Vi, Exclusion Procedure.
* Use of counterfeit or stolen fare media
* Assault or threat of assault,
* Stealing or willfully damaging, defacing or destroying Metro property. The City will prosecute anyone who steals or willfully damages, defaces or destroys Metro property.
« Lighting an incendiary device (e.g. match, lighter, torch).
* Obstructing or interfering with the Bus Operator's safe operation of the bus
* indecent exposure
* Entering or remaining on Metro buses after having been notified by an authorized individual not to do so, or boarding or remaining on Metro buses during the period when an individual has been banned from the premises. See NON-COMPLIANCE WITH EXCLUSION ORDER (XIII).
*591 [[Image here]]
*592 [[Image here]]

 This is a review of a published decision of the court of appeals, Wisconsin Carry, Inc. v. City of Madison, 2015 WI App 74, 365 Wis. 2d 71, 870 N.W.2d 675, affirming the circuit court's dismissal of a complaint seeking declaratory relief against Respondent.

 Although the Rule's terms provide the impetus for this case, neither party ever identified the operative language we are supposed to be considering. Nor does the Rule appear anywhere in the record. Inasmuch as the City does not deny enforcing a policy against carrying weapons on city buses, we take notice of the Rule as found on the City's website (http://www.cityofmadison.com/metro/documents/ RulesofCon-duct.pdf) and include relevant portions as Appendix A. The same prohibition appears in the City's "Ride Guide" (relevant portions of which we reproduce as Appendix B) and we take notice of it as well. We may take notice of this material pursuant to Wis. Stat. § 902.01(2)(b) & (3) (2013-14).

 Rule at 4; Appendix A at 2. The Ride Guide is similar: "For the safety and comfort of all riders: . . . No weapons allowed of any kind." Ride Guide at 6; Appendix B at 2.

 "Metro Transit" is a sub-unit of the City of Madison. See infra part III.B.1.b.

 All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

 This statute defines "political subdivision" as "a city, village, town or county." Wis. Stat. § 66.0409(l)(b).

 Petitioners styled their pleading as a "petition"; except in circumstances not present here, however, our rules identify the initial pleading as a "complaint." See Wis. Stat. § 802.01(1). For the sake of uniformity across our opinions, we will refer to the petitioners' initial pleading as a "complaint."

 The Honorable Ellen K. Berz presiding.

 Wisconsin Carry, in its complaint, said it instituted this action to "determine the legality of the policies and practices of [the City] from prohibiting possession of weapons by persons riding Madison Metro buses . . .." Wisconsin Carry also says that it "[has] an interest in [its] rights to carry firearms on Madison Metro buses," and that "[The City's] policies and practices prohibit persons from riding Madison Metro buses while armed .. . ."

 We address the constitutional provisions regarding the right to keep and bear arms to provide background and context for our application of the statutes and ordinances Wisconsin Carry puts at issue.

 See District of Columbia v. Heller, 554 U.S. 570, 593—94 (2008) ("By the time of the founding, the right to have arms *555 had become fundamental for English subjects. See [J. Malcolm, To Keep and Bear Arms 122-134 (1994)]. Blackstone, whose works, we have said, 'constituted the preeminent authority on English law for the founding generation,' Alden v. Maine, 527 U.S. 706, 715 (1999), cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen. See [1 William Blackstone, Commentaries on the Laws of England 136, 139-140 (1765)]."); State v. Cole, 2003 WI 112, ¶ 20, 264 Wis. 2d 520, 605 N.W.2d 328 (Wilcox, J.) (plurality opinion) ("We find that the state constitutional right to bear arms is fundamental.").
Notwithstanding Heller's careful demonstration that this right has been fundamental since before our Nation's founding, the dissent says it is something less. But it does not say when or how it was demoted.

 A "weapon" is "a handgun, an electric weapon, as defined in s. 941.295(1c)(a), or a billy club." Wis. Stat. § 175.60(1)(j).

 The City made this argument explicitly before the Circuit Court. Here, it is an implicit part of its argument that the Local Regulation Statute does not apply because it addresses only ordinances and resolutions (which are the legislative devices of political subdivisions).

 We express no opinion on the City's authority to regulate the possession of weapons on its buses prior to enactment of the Local Regulation Statute, the Concealed-Carry Statute, and the current version of the Vehicle Statute.

 The dissent faults us for emphasizing that the "plain meaning" doctrine focuses on the statute's meaning. We think discovering the meaning of a statute is not just a worthy-endeavor, but also an exhaustive recitation of the judiciary's authority when interpreting a statute. We find the statute's meaning in its words, context, and interaction with closely-related statutes, just as Kalal describes.

 This proposition follows by necessary implication from the fact that municipalities have no authority but what they are given. Willow Creek Ranch, LLC v. Town of Shelby, 2000 WI 56, ¶ 17, 235 Wis. 2d 409, 611 N.W.2d 693 (citing First Wis. Nat'l Bank of Milwaukee v. Town of Catawba, 183 Wis. 220, 224, 197 N.W. 1013 (1924) ("Municipal bodies have only such powers as are expressly conferred upon them by the legislature or are necessarily implied from the powers conferred.")).

 This generality comports well with the dictionary definition of "ordinance": "An authoritative law or decree; specif., a municipal regulation, esp. one that forbids or restricts an activity." Ordinance, Black's Law Dictionary (10th ed. 2014). It also compares favorably with Doe v. Medford Sch. Dist. 549C, 221 P.3d 787 (Or. App. 2009), a case the City cited in its discussion about the nature of ordinances. There, the court said:
The term "ordinance," as it is used in ordinary communications, has both a narrow and a broader meaning. [In its narrow meaning] [i]t can refer to "a public enactment, rule, or law promulgated by governmental authority: as . .. a local law or regulation enacted by a city council or other similar body under powers delegated to it by the state.". . . The word "ordinance" also has a broader common meaning, however. At least in some contexts, the term may not be limited to enactments of law but, more generally to an "established rule, policy, or practice."
Id. at 793 (quoting Webster's Third New Int'l Dictionary 1588 (unabridged ed. 1993)).

 See supra n.16.

 "[T]he governing body of a city shall... provide for the nonpartisan management of a municipal public utility by creating a commission under this section." Wis. Stat. § 66.0805(1).

 For example, the statute says a transit commission may appoint certain employees, conduct hearings, hold regular meetings, adopt a seal, etc. Wis. Stat. § 66.1021(6) & (7).

 Madison, Wis., Gen. Ordinances § 3.14(4)(a) ("There is hereby created a Transit and Parking Commission charged with the duties and responsibilities contained herein.").

 We may consider the statute's purpose while conducting a "plain meaning" analysis, so long as we refer only to the statute's text and structure. State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶ 48, 271 Wis. 2d 633, 681 N.W.2d 110 (" [S] cope, context, and purpose are perfectly relevant to a plain-meaning interpretation of an unambiguous statute as long as the scope, context, and purpose are ascertainable from the text and structure of the statute itself, rather than extrinsic sources, such as legislative history.").

 The dissent wishes we had consulted legislative history on this question, and suggests we did not do so because it would contradict our interpretation of the Local Regulation Statute. We did not address legislative history for two reasons. First, we had no difficulty finding the statute's meaning without it (as Kalal contemplates). And second, the history the *569 dissent identified has no instructive merit. The two failed municipal gun-control referenda mentioned in State v. Cole, 264 Wis. 2d 520, ¶¶ 62-63 (Prosser, J., concurring), and the statements of one assemblyman, might be able to tell us what motivated the legislature to enact the Local Regulation Statute. But motivation and meaning are not necessarily the same thing. Even if every legislator publicly announced the intent behind the way he or she voted, that knowledge would give us no aid in understanding the Local Regulation Statute. We find the legislature's intent in the words it adopts, not the expressed (or unexpressed) subjective reasons the 132 legislators had for adopting those words. Kalal, 271 Wis. 2d 633, ¶ 52. Cherry-picking the statements of one such legislator, as the dissent does, just gives us 1/132 of a body of information that tells us nothing about the meaning of the statute.

 The Commission's members are appointed, not elected: "The Transit and Parking Commission shall consist of nine (9) voting members to serve without compensation consisting of three (3) members of the Common Council, six (6) citizens and two (2) alternates ... at least one (1) of whom shall be a citizen." Madison, Wis., Gen. Ordinances § 3.14(4)(b). "Citizen members of the Transit and Parking Commission shall be appointed by the Mayor subject to confirmation by the Common Council." Id. § 3.14(4)(d).

 The City argued that this conclusion would "deprive the people of Wisconsin [of] the right to democratically decide if public buses are an appropriate place for loaded handguns." Actually, it protects that very thing. The people of Wisconsin, through their duly-elected legislators, have had their say on this issue. Allowing an unelected body like the Commission to overrule the people's decision would not protect their democratically-expressed will, it would thwart it.

 The relevant portion of the Idaho statute says:
(2) Except as expressly authorized by state statute, no county, city, agency, board or any other political subdivision of this state may adopt or enforce any law, rule, regulation, or ordinance which regulates in any manner the sale, acquisition, transfer, ownership, possession, transportation, carrying or storage of firearms or any element relating to firearms and components thereof, including ammunition.
Idaho Code Ann. § 18-3302J(2) (2016).

 The relevant portion of the Florida Statute says:
(1) Preemption.—Except as expressly provided by the State Constitution or general law, the Legislature hereby declares that it is occupying the whole field of regulation of firearms and ammunition, including the purchase, sale, transfer, taxation, manufacture, ownership, possession, storage, and transportation *572 thereof, to the exclusion of all existing and future county, city, town, or municipal ordinances or any administrative regulations or rules adopted by local or state government relating thereto. Any such existing ordinances, rules, or regulations are hereby declared null and void.
Fla. Stat. Ann. § 790.33(1) (West 2007 & Supp. 2016).

 The relevant portion of the Kansas statute says:
(a) No city or county shall adopt or enforce any ordinance, resolution or regulation, and no agent of any city or county shall take any administrative action, governing the requirement of fees, licenses or permits for, the commerce in or the sale, purchase, transfer, ownership, storage, carrying, transporting or taxation of firearms or ammunition, or any component or combination thereof.
Kan. Stat. Ann. § 12-16,124(a) (Supp. 2015).

 As an alternative to listing a multitude of labels for prohibited legislation, some states instead use a catch-all phrase to describe the method by which the legislative act is adopted. Arkansas, for example, states that local governments "shall not enact any ordinance or regulation pertaining to, or regulate in any other manner" the identified subjects. Ark. Code. Ann. § 14—16-504(b)(1)(A) (2013) (emphasis added). Kansas, on the other hand, forbids local "administrative action" related to firearms. Kan. Stat. Ann. § 12-16,124 (Supp. 2015). But this does not end the lexical chase, it just shifts it to the label given to the municipal action that produces the legislation.

 Under the guise of "judicial restraint," however, this is how the dissent would have us understand the Local Regulation Statute. Its two-sentence statutory analysis comprises, in its entirety, this: "The bus rule is neither an 'ordinance' nor a 'resolution,' and it was not enacted by the city. That should be the end of the analysis." Dissent at ¶ 73. But "judicial restraint" does not mean superficial or incomplete. The dissent is curiously incurious about whether municipalities have legislative authority outside of "ordinances" and "resolutions." Instead, without analysis, it simply assumes they do, and further assumes the Commission's authority to adopt the Rule flows from that phantom authority. While that analysis is certainly original, it has nothing to do with judicial restraint.

 Kalal, 271 Wis. 2d 633, ¶ 46 ("[Statutory language is interpreted.. . reasonably, to avoid absurd or unreasonable results.").

 Wis. Stat. § 66.0409(2).

 The Local Regulation Statute authorizes local legislation so long as it is both the "same as or similar to" and "no more stringent than" a state statute. Because the stringency analysis resolves this matter, we need not inquire into whether the Rule or Ordinance is the same as or similar to a state statute.

 As an entirely practical matter, an individual can carry a weapon in only one vehicle at a time, so there is no need to use "any" or "all" in the statute. "Any" bus in the City's fleet becomes "a" bus within the meaning of this statute the instant an individual boards it with a permissible firearm. The same is true of "all" city buses. So there is no point in distinguishing between "a" bus, on the one hand, and on the other "any" or "all" buses.

 "Property rights in a physical thing have been described as the rights to possess, use and dispose of it... . The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *577 Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citation and internal quotation marks omitted); Rakas v. Illinois, 439 U.S. 128, 143 (1978) ("One of the main rights attaching to property is the right to exclude others . ..." (citing W. Blackstone, Commentaries, Book 2, ch. 1")); Jacque v. Steenberg Homes, Inc., 209 Wis. 2d 605, 618, 563 N.W.2d 154 (1997) ("[T]he private landowner's right to exclude others from his or her land is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" (quoting Dolan v. City of Tigard, 512 U.S. 374, 384 (1994))).

 Wis. Stat. § 66.0409(2) (emphasis added).

 "[T]he people of the several States are the only true source of power .... All powers that the Constitution neither *578 delegates to the Federal Government nor prohibits to the States are controlled by the people of each State." U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 847-48 (1995); see also W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 641 (1943) ("There is no mysticism in the American concept of the State or of the nature or origin of its authority. We set up government by consent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent. Authority here is to be controlled by public opinion, not public opinion by authority."); Halter v. Nebraska, 205 U.S. 34, 43 (1907) ("It is not extravagant to say that to all lovers of the country [the American flag] signifies government resting on the consent of the governed ...."); Texas v. White, 74 U.S. (7 Wall.) 700 (1868) ("A State, in the ordinary sense of the Constitution, is a political community of free citizens, occupying a territory of defined boundaries, and organized under a government sanctioned and limited by a written constitution, and established by the consent of the governed."); Goodall v. City of Milwaukee, 5 Wis. 32, 38 (1856) ("In England, the Parliament is said to be supreme, omnipotent, and to its mandates the highest, as well as the lowest, in all their rights and acquisitions must yield. Not so here; all departments of government derive their powers from the prescribed consent of the people who are governed".

 "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421, (1819). Johnston v. City of Sheboygan, 30 Wis. 2d 179, 186, 140 N.W.2d 247 (1966) (quoting M'Culloch).

 The other First Amendment cases the City cited rely, at least in part, on Adderley. See U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129 (1981) (citing Adderley in the process of analyzing First Amendment challenge to Postal Service's right to restrict access to mailboxes); Lehman v. City of Shaker Heights, 418 U.S. 298, 303 (1974) (citing Adderley in the process of analyzing First Amendment challenge to City's right to deny advertising request on public buses).

 "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972); see also, Penterman v. Wis. Elec. Power Co., *581 211 Wis. 2d 458, 480, 565 N.W.2d 521 (1997) (quoting Roth's proposition, supra, that property interests are created and defined by independent sources such as state law).

 " 'Weapon' means a handgun, an electric weapon, as defined in s. 941.295(1c)(a), or a billy club." Wis. Stat. § 175.60(1)(j).

 The City's authority to ban handguns has been withdrawn by the Local Regulation Statute, as described above.

 The exceptions cover only the following:
*583 • Certain restrictions imposed by employers on their employees (Wis. Stat. § 175.60(15m);
• Certain types of buildings, consisting of (Wis. Stat. § 175.60(16)):
1. Any portion of a building that is a police station, sheriffs office, state patrol station, or the office of a division of criminal investigation special agent of the department;
2. Any portion of a building that is a prison, jail, house of correction, or secured correctional facility;
3. The facility established under § 46.055 [secure mental health facility for sexually violent persons];
4. The center established under § 46.056 [the Wisconsin Resource Center located on the grounds of the Winnebago Mental Health Institute];
5. Any secured unit or secured portion of a mental health institute under § 51.05, including a facility designated as the Maximum Security Facility at Mendota Mental Health Institute;
6. Any portion of a building that is a county, state, or federal courthouse;
7. Any portion of a building that is a municipal courtroom if court is in session;
8. A place beyond a security checkpoint in an airport;
• Restrictions imposed by authorized persons on lands, residences, commercial buildings, special event locations, buildings that are owned, occupied, or controlled by state or local governmental units, and university or college grounds or buildings (Wis. Stat. § 943.13(lm)(c)); and
• School grounds (Wis. Stat. § 948.605(2)(b)lr).

 Town of Madison v. City of Madison, 269 Wis. 609, 614, 70 N.W.2d 249 (1955) ("All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it,... they are therefore to be construed in connection with and in harmony with the existing *584 law, and as a part of a general and uniform system of jurisprudence, that is, they are to be construed with a reference to the whole system of law of which they form a part.").

 There are, of course, certain and well-defined places one may not carry a concealed weapon, e.g., jails, mental health institutions, courthouses, etc. See Wis. Stat. § 175.60(16)(a). The nature of these exceptions reinforces the uniformity inherent in the Concealed-Carry Statute. The common thread running through each is that they describe places where there are obvious and elevated security concerns. This statute is exactly what one would expect of a law aimed at maximizing statewide uniformity while simultaneously controlling for legitimate security concerns.