**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 30, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.   2021AP1955
                        2022AP102**

Cir. Ct. No.  2021ME3

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

---

IN THE MATTER OF THE MENTAL COMMITMENT OF C. B. O.:

TREMPEALEAU COUNTY,

   PETITIONER-RESPONDENT,

 V.

C. B. O.,

   RESPONDENT-APPELLANT.

---

APPEALS from orders of the circuit court for Trempealeau County: SCOTT L. HORNE, Judge. *Reversed*.

¶1     STARK, P.J.[1]   In these consolidated appeals,[2] Chris[3] appeals from an order committing him under WIS. STAT. ch. 51 and from an order extending his commitment for an additional year.   Chris argues that both orders should be reversed because Trempealeau County (the County) failed to present sufficient evidence that he is dangerous pursuant to WIS. STAT. § 51.20(1)(a)2. at both his initial commitment and recommitment hearings.   Chris also asserts that the circuit court, at his commitment hearing, failed to make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. under which it found Chris to be dangerous, as required by our supreme court in ***Langlade County v. D.J.W.***, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277.   We agree that the court failed to make the specific factual findings required by ***D.J.W.*** at Chris's commitment hearing and that the County did not present sufficient evidence to establish that Chris is dangerous during either his initial commitment or recommitment proceedings.   Accordingly, we reverse both orders.

**BACKGROUND**

¶2     On February 25, 2021, Chris was placed under an emergency detention.   *See* WIS. STAT. § 51.15.   The circuit court held a probable cause

---

[1] These appeals are decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20).  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] On March 4, 2022, the appellant moved to consolidate appeal Nos. 2021AP1955 and 2022AP102.  By order, we denied the motion, noting that the first appeal was already in the briefing stage.  Instead of consolidating the cases, we directed that the briefing "be submitted to the court at the same time to be handled as companion cases."  Upon review of the briefs, however, we order these cases to be consolidated for disposition on our own motion.

[3] For ease of reading, we use a pseudonym when referring to the appellant in these confidential matters.

2

hearing, found probable cause for commitment, and ordered two doctors to examine Chris and prepare written reports prior to the final commitment hearing.

¶3      At the final hearing, on March 11, 2021, Deputy Ross Huson with the Trempealeau County Sheriff's Department (the department) testified regarding the events that led to Chris's emergency detention.  According to Huson, one of Chris's family members had called the department and requested that it conduct a welfare check on Chris.  The family member reported that Chris "had left some disturbing voicemails on a family member's phone talking about hitmen and hangmen coming to get him."  Huson testified that he went to Chris's apartment to check on him, but he was unable to speak with Chris, as the doors of the apartment complex were "barricaded" from the interior of the apartment complex.  Huson explained that at the time, Chris was the only occupant in the four-unit apartment complex.  Huson then contacted the Trempealeau County Housing Authority, which helped him remove the barricades from the door.[4]

¶4      The following day, Huson and other officers made contact with Chris inside his residence after Chris invited them in to talk.  Huson described the residence as "very clean" and "in good living condition."  According to Huson, Chris explained that he had barricaded the doors of the apartment complex because he was concerned that hitmen were there to get him.  Chris also told Huson that the hitmen had been in the hallway outside his door with guns the night before and that he had called 911 to have the dispatchers run the license plates of

---

[4] The Housing Authority also informed Huson that Chris had barricaded the door on three previous occasions and that other tenants would be moving into the apartment complex within "the next day or that coming weekend."

the cars he had seen drive by that he believed belonged to the hitmen. Huson testified that when he asked Chris why hitmen would be trying to harm him, Chris "didn't have an explanation, he mumbled a lot. He was hard to understand and he—his conversation was going several different directions." Additionally, Huson testified that Chris told him that Chris tried to retrieve a firearm that he had previously sold to his son, explaining that he felt he needed a firearm for his safety. Huson stated that Chris had also been to the sheriff's department "a couple weeks prior" to the emergency detention, seeking the department's help in retrieving the firearm from his son.

¶5     While inside the residence, Chris permitted officers to "look around." Huson observed a crossbow, a compound bow, and an arrow all stored in Chris's second bedroom as well as a hatchet next to Chris's bed. In addition, Huson found a hunting knife in a sheath inside a charcoal grill located next to the door, and Chris commented that he needed the knife "for safety." On cross-examination, Huson testified that he was not aware of any reports of Chris wielding any of the weapons observed in his apartment, nor was he aware that Chris had made any specific threats to another person. Huson explained, however, that he detained Chris because he felt there was a "safety concern that unknown individuals to [Chris] could, you know, make him believe that these were hitmen and just having the access to weapons inside the house, I was concerned for his safety as well as safety to anybody else."

¶6      Doctor Thomas Ledoux, a psychologist, also testified at the final hearing.[5]  He explained that his attempt at examining Chris was relatively short because Chris politely invoked his right to remain silent and declined to participate in the examination.  *See* WIS. STAT. § 51.20(9)(a)4.  After speaking with Chris's attending psychiatrist and reviewing the statement of emergency detention and admission records, Ledoux diagnosed Chris with schizoaffective disorder, characterized by psychosis, paranoia, and delusions that impacted his ability to "kind of reality test in his daily life."  He opined that Chris's condition was treatable with medication.

¶7      According to Ledoux, Chris's thoughts and beliefs were a "departure from reality," and he displayed unsafe behaviors, "mainly very unsafe to himself, potentially other people"—specifically, barricading himself in his apartment resulting from his belief that hitmen were out to get him.  Ledoux emphasized that Chris's efforts to obtain a firearm were concerning, which Ledoux believed to be "in connection with [his] fear that hitmen were after him."  Ledoux testified that he was concerned Chris might think future tenants were a threat, and he could harm them.  When asked to elaborate on his concerns regarding Chris's safety, Ledoux explained:

> So my concern, so he was—he wasn't making any, as far as I know, he was not making any direct threats to other people or even to himself.  However, I believe that being in the psychotic state, he did have impaired judgment.  Pair[ed] with treatment nonadherence, lack of insight in his condition, I was concerned about his ability, his safety in

---

[5] Although Chris argues that Ledoux's examination report was not entered into evidence, our review of the record indicates that the County moved for admission of Ledoux's report at the final hearing, and it was received by the circuit court.  Ledoux's testimony at the hearing was consistent with the information contained in his report.

the community. Again, my main concern is trying to possess a firearm while in that paranoid psychotic state seemed dangerous to me.

¶8 At the close of evidence, the County claimed that Chris was dangerous due to his access to weapons and the possibility that Chris could mistake future tenants for hitmen. The County, however, did not specify on the record what statutory dangerousness standard it believed it had proved. Chris's counsel expressed his concern that the testimony involved "a lot of potentials being thrown around and that [Chris is] potentially dangerous, he could potentially hurt someone. But there's been no overt act toward any of that…. There need[s] to be some outward sign of actual dangerousness and I don't think that that has been presented at all."

¶9 The circuit court concluded that Chris was mentally ill, a proper subject for treatment, and dangerous. The court explained that there were concerns Chris would "act out violently" toward a person he misperceived to be a hitman and that, in barricading the front door to the complex, Chris was taking action "on the basis of that apparently psychotic belief." The court then stated:

> There were weapons available. The deputy observed a crossbow, compound bow and arrow, a hatchet and a hunting knife in a grill. [Chris] had indicated that he viewed that as a weapon, he needed it for his safety.
>
> Apparently sometime earlier he—he had been attempting to acquire firearms. I don't know that I can connect that to the mental state; apparently that was a couple of weeks earlier and at least there appears to be a gap in the testimony in terms of the motivation for attempting to acquire the firearms.

¶10 The circuit court found credible Ledoux's opinion that Chris "presents a substantial risk of physical harm to others." The court further reasoned:

> The mechanism that he views as causing harm I accept as credible; that is that [Chris], one of the delusions is that he views other people as hitmen or threatening to him. The obvious response to that is defense. It appeared that he was taking actions consistent with that by barricading the apartment through the cord preventing people from entering the apartment with weapons inside that would be available to defend himself.
>
> At the time Deputy Huson arrived, [Chris] was the only resident of the four unit apartment. However, there are other residents who were in the process or imminently moving in and the credible concern from the court's perspective is that [Chris] would in the midst of his delusions view those individuals as potential hitmen and respond violently in response to that delusion.

The court concluded that Chris presents "a significant risk of serious physical harm to others, given the risk of danger … [and] history of noncompliance with treatment." The court entered a six-month commitment order and an accompanying order for involuntary medication and treatment.[6]

¶11 One month before Chris's initial commitment expired on September 11, 2021, the County filed a petition for recommitment. At the recommitment hearing, Dr. James Scott Persing, a psychiatrist, testified regarding his examination of Chris conducted prior to the recommitment hearing.[7] Persing testified that his findings were based on an evaluation of Chris, in which Chris participated, as well as a document review. Persing diagnosed Chris with

---

[6] The circuit court held a separate hearing to address the medication order. Chris refused to appear at the hearing. At that hearing, Dr. Jared Gorsuch, a psychiatrist, testified and opined that Chris was not competent to refuse medication. As Chris does not challenge the medication order, we will not discuss the details of Gorsuch's testimony further. We do note that Gorsuch's examination report was entered into evidence at the hearing addressing the medication order.

[7] Persing testified that he produced a report based on his examination of Chris, but the report was never admitted into evidence at the recommitment hearing. Accordingly, we do not consider the contents of that report in our decision. *See* ***Langlade County v. D.J.W.***, 2020 WI 41, ¶7 n.4, 391 Wis. 2d 231, 942 N.W.2d 277.

schizoaffective disorder and explained that he was currently prescribed an antipsychotic medication. According to Persing, Chris's treatment was going "quite well," and Chris was living independently in his own apartment. However, Persing opined, based on Chris's statements, that Chris's compliance with his treatment was only a result of the circuit court order. Persing further believed that Chris would not take medication for his mental illness without a court order. Persing explained that Chris "would have rather rapid return of symptoms and have concerns about being potentially harmed to the point of being a danger to the community."

¶12 Persing described Chris's belief that his previous commitment was unjust, stating that Chris believed:

> that what occurred at the time of his detention was a misunderstanding, that it was unjust and that it was unnecessary. And he's gone through this process because of the [circuit] court order being in place, but again feels that it was unjust and does not have any recollection of the items that were outlined in the officer's notes and the emergency detention papers regarding him potentially having a potential harm to someone who may or may not be present, may or may not have a weapon, may or may not be intending him harm.

According to Persing, he was primarily concerned about the "safety of the community, but if [Chris] was unarmed and tried to defend, for instance, himself against a perceived threat, then my [concern] would be for him." On cross-examination, Persing confirmed that Chris had not made any threats to individuals or expressed suicidal or homicidal ideation. When asked, Persing also admitted that he could not "say with 100 percent certainty that there would be a substantial probability of harm" from Chris as he could only give his "best psychiatric opinion."

¶13 Following Persing's testimony, Chris's counsel moved for dismissal based on insufficient evidence of dangerousness, explaining that case law provided that "a diagnosis of schizophrenia by itself does not demonstrate requisite substantial probability of physical impairment." The circuit court denied Chris's motion, reasoning that "[t]he requisite degree of dangerousness was established at the time of the original hearing and the court did find a nexus between the mental health condition and the dangerousness as evinced by [Chris's] actions at the time."

¶14 Chris testified next. He explained that since the original commitment order was entered, he had been participating in his treatment and taking his medication, that he lived independently and took care of his own needs, and that he had not had any police contact. Chris also testified that he had never harmed anyone and that the initial commitment had been a "misunderstanding." Chris explained that he had called the police because there had been a man in the hallway with a gun, but by the time the police arrived the man had left. Chris confirmed that he believed his medication was unnecessary and that he would not take it if he were not on commitment, but he testified that he would continue to participate in other treatment services through the County.

¶15 In a subsequent oral ruling, the circuit court concluded that Chris would be a proper subject for commitment if treatment were withdrawn and that he was dangerous under WIS. STAT. § 51.20(1)(a)2.b. The court found Persing's testimony to be credible. The court then summarized the events of the initial commitment, highlighting that Chris believed that hangmen or hitmen were coming to get him and that "[Chris] felt it necessary to arm himself to ward off the threat." According to the court,

9

> When [Huson] arrived, [Chris] had armed himself with a crossbow, with knives. There was evidence that he had attempted to acquire a firearm from family members all for the purpose of defending himself against the imaginary hitmen or hangmen that he felt were coming to harm him.
>
> He was found to be dangerous because of the significant likelihood that he would misconstrue an innocent person as the hangman or hitman and react with the weapons that he had acquired due to the delusion that he was being threatened.

¶16 After acknowledging Chris's compliance with his medication and treatment and his ability to return to living independently in his home, the circuit court explained:

> And I certainly under[stand] [Chris's counsel's] argument that by virtue of that improvement, the court would not be in a position to find that the [C]ounty has met its burden with respect to dangerousness. However, it's also apparent in the interview with Dr. Persing that [Chris] still persists in the belief that the original commitment was a violation of his rights, that it was baseless, that he was not delusional, that he was not attempting to acquire weapons to defend himself from the hitmen or hangmen; that he was simply trying to recover a firearm from a family member that apparently had been in the possession of the family member for about a year.

The court further discussed Chris's attempt to obtain a firearm, stating that at the time of the initial commitment, the court had found that Chris's explanation was not credible, and that "it appeared to be an action that was taken because of the delusion that people were coming to get him and that he needed the firearm and other weapons to defend himself and indicates it was a logical inference that he would be prepared to use those weapons."

¶17 The circuit court also noted that Chris had stated that if treatment were withdrawn, he would not continue to take medication, which the court described as "instrumental in his improvement." The court repeated Persing's

opinion that Chris would "decompensate and approach his original condition" if treatment were withdrawn. It ultimately concluded that "there's a high probability that [Chris] would become dangerous to others or that others would be placed in reasonable fear of his behaviors and substantial physical harm" and a likelihood that Chris "could lash out at others because of a mistaken belief that they were hangmen or hitmen or similar individuals who he misperceived as being present to threaten him."

¶18    The circuit court subsequently entered an order for involuntary medication and treatment and extended Chris's commitment for an additional year. Chris appeals from both the initial commitment order and from the order extending his commitment.

## DISCUSSION

¶19    To involuntarily commit a person, the petitioner must prove three elements by clear and convincing evidence: (1) the person is mentally ill, (2) the person is a proper subject for treatment, and (3) the person is dangerous. *See* WIS. STAT. § 51.20(1)(a)1.-2., (13)(e); *D.J.W.*, 391 Wis. 2d 231, ¶29. Section 51.20(1)(a)2.a.-e. outlines the five standards by which a person may be found "dangerous," and a person must be found dangerous under at least one of those standards to be committed. *D.J.W.*, 391 Wis. 2d 231, ¶30. Each standard requires the petitioner to "identify recent acts or omissions demonstrating that the individual is a danger to himself [or herself] or to others." *Portage County v. J.W.K.*, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509. All of the standards require that the petitioner prove a "substantial probability" of dangerousness, which has been defined as "much more likely than not." *Marathon County v.*

***D.K.***, 2020 WI 8, ¶35, 390 Wis. 2d 50, 937 N.W.2d 901. While certainty is not required, "mere possibility and conjecture are insufficient." ***Id.***, ¶52.

¶20 After an initial six-month commitment order, the circuit court may extend an individual's commitment for up to one year. WIS. STAT. § 51.20(13)(g)1.; ***D.J.W.***, 391 Wis. 2d 231, ¶31. The same dangerousness standards apply where the petitioner seeks to extend a commitment, except that the petitioner may alternatively prove dangerousness by "showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment [under one of the five dangerousness standards] if treatment were withdrawn." Sec. 51.20(1)(am). Section 51.20(1)(am) recognizes that "an individual's behavior might change while receiving treatment" in that the individual "may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior." ***J.W.K.***, 386 Wis. 2d 672, ¶19. Dangerousness, however, "remains an element to be proven to support both the initial commitment and any extension." ***Id.*** Accordingly, our supreme court determined that a recommitment under § 51.20(1)(am) must be grounded "in the subdivision paragraphs of subd. 2." ***D.J.W.***, 391 Wis. 2d 231, ¶41. Thus, "circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of … § 51.20(1)(a)2. on which the recommitment is based." ***D.J.W.***, 391 Wis. 2d 231, ¶3.

¶21 Whether the petitioner has met its burden of proof in a commitment proceeding is a mixed question of fact and law. *See id.*, ¶24. We review a circuit court's findings of fact for clear error, but we independently determine whether

the facts satisfy the legal standard. ***Waukesha County v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.

¶22 On appeal, Chris argues that the evidence the County presented at both his initial commitment and the recommitment hearings was insufficient to establish that he is dangerous under any of the five subdivision paragraphs of WIS. STAT. § 51.20(1)(a)2.[8] For the reasons that follow, we conclude that the County did not meet its burden at either hearing to show by clear and convincing evidence that Chris is dangerous to himself or others under that statute.

## I. Initial Commitment

### *a. The Appeal from Chris's Initial Commitment Order is Not Moot.*

¶23 The County argues that Chris's appeal from his initial commitment order is moot because the initial six-month commitment and medication orders expired on September 11, 2021. Chris acknowledges that these orders have expired, but he argues that he is still subject to collateral consequences of his commitment, namely a firearms ban. According to Chris, our supreme court's decision in ***D.K.*** "provides a clear rule that appeals from original commitments are not moot." Whether an issue is moot is a question of law that we review de novo. ***D.K.***, 390 Wis. 2d 50, ¶16.

¶24 Our supreme court recently addressed the mootness doctrine as it relates to *recommitments* under WIS. STAT. ch. 51 in ***Sauk County v. S.A.M.***, 2022

_____

[8] Chris does not challenge the circuit court's findings that he is mentally ill and a proper subject for treatment. *See* WIS. STAT. § 51.20(1)(a)1. Chris also does not challenge the orders for involuntary medication and treatment.

WI 46, 402 Wis. 2d 379, 975 N.W.2d 162. There, however, the court also reiterated the law as it relates to *initial commitments*, explaining that

> [t]wo terms ago, we held that an appeal of an expired *initial* commitment order is not moot because the order collaterally subjects the committed person to a continuing firearms ban. *See* [*D.K.*, 390 Wis. 2d 50,] ¶25. We recognized that this firearms ban constitutes an ongoing impairment of the person's constitutional right to bear arms, which we deemed to be "no minor consequence." *Id.* (citing U.S. CONST. amend. II; WIS. CONST. art. I, § 25; *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Wis[consin] Carry, Inc. v. City of Madison*, 2017 WI 19, 373 Wis. 2d 543, 892 N.W.2d 233). We also explained that prevailing in an appeal of an expired initial commitment order voids the firearms ban. *Id.* Because voiding the firearms ban is a "practical effect" that has a "causal relationship" to the successful appeal of an expired initial commitment order, we deemed the appeal not moot. *Id.*

*S.A.M.*, 402 Wis. 2d 379, ¶21. Accordingly, we agree with Chris that his appeal of the expired initial commitment order is not moot as Chris continues to suffer the collateral consequences of the firearms ban required under a commitment order.[9] *See* WIS. STAT. § 51.20(13)(cv)1. We therefore address the merits of Chris's appeal of his initial commitment.

### b. The Circuit Court Failed to Make Required Dangerousness Findings.

¶25 We note at the outset that the circuit court failed to make specific factual findings as to which of the five statutory standards of dangerousness under WIS. STAT. § 51.20(1)(a)2.a.-e. the County established to support Chris's initial commitment. In *D.J.W.*, our supreme court stated "that going forward circuit

---

[9] We note that our supreme court determined in *Sauk County v. S.A.M.*, 2022 WI 46, ¶24, 402 Wis. 2d 379, 975 N.W.2d 162, that liability for the cost of care is also a collateral consequence sufficient to render a recommitment appeal not moot. In this case, Chris does not argue liability for the cost of care as a collateral consequence; thus, we do not address it further.

courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based." *D.J.W.*, 391 Wis. 2d 231, ¶3. The court observed that this requirement serves two purposes. *Id.*, ¶42. "First, it provides clarity and extra protection to patients regarding the underlying basis for a recommitment." *Id.* "Second, a requirement of specific factual findings with reference to a subdivision paragraph of … § 51.20(1)(a)2. will clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making, specifically with regard to challenges based on the sufficiency of the evidence." *D.J.W.*, 391 Wis. 2d 231, ¶44.

¶26    Chris argues that during the initial commitment proceedings in this case, the circuit court did not "make a statutory citation to any standard of dangerousness," it "was not obvious which standard the court determined was met," and the court's failure to articulate the standard of dangerousness "has frustrated effective appellate review." He therefore asserts that the appropriate remedy for the court's *D.J.W.* violation is outright reversal. *See Sheboygan County v. M.W.*, 2022 WI 40, ¶¶4, 38, 402 Wis. 2d 1, 974 N.W.2d 733.

¶27    In contrast, the County claims that *D.J.W.*'s directive is only applicable in recommitment proceedings, not initial commitments. Further, even if the *D.J.W.* requirement were to apply in this case, the County contends that the circuit court "made the finding that [Chris] 'does present a significant risk of

15

serious physical harm to others,'" which "is a direct *reference* to" WIS. STAT. § 51.20(1)(a)2.b. and (1)(a)2.c.[10]

¶28 Upon our review of the record in this case, we agree that the circuit court violated *D.J.W.*'s directive by failing to reference a specific subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. when finding that Chris is dangerous or to make findings that correlate to the elements of dangerousness under a specific subdivision paragraph. We disagree with the County's assertion that *D.J.W.*'s directive is only applicable in recommitment proceedings, as the rationale for our supreme court's decision in *D.J.W.* is equally applicable to initial commitments. *See D.J.W.*, 391 Wis. 2d 231, ¶¶43-44; *Trempealeau County v. B.K.*, No. 2020AP1166, unpublished slip op. ¶17 n.3 (WI App July 26, 2021); *Winnebago County v. A.A.L.*, No. 2020AP1511, unpublished slip op. ¶17 n.8 (WI App Mar. 24, 2021).[11]

¶29 Further, we reject the County's claim that the circuit court's reference to "physical harm to others" was sufficient to establish the standard of dangerousness under WIS. STAT. § 51.20(1)(a)2. As the County noted, "physical harm to others" could either reference § 51.20(1)(a)2.b. or (1)(a)2.c. While the

---

[10] The County, however, fails to make any argument on appeal that WIS. STAT. § 51.20(1)(a)2.b. is applicable under the facts.

[11] Unpublished opinions authored by a single judge, issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

County argues that subd. para. (1)(a)2.c. is applicable, it is unclear from the record which standard provided the basis for the court's decision.[12]

¶30    This court recently addressed a *D.J.W.* violation in a recommitment proceeding. *Barron County v. K.L.*, No. 2021AP133, unpublished slip op. (WI App Aug. 9, 2022). In that unpublished decision, we concluded that the *D.J.W.* violation was harmless error, as the subject of the recommitment did not challenge the sufficiency of the evidence to support the circuit court's determination of dangerousness, and as it was clear from the record on which subdivision paragraph the court had based its determination of dangerousness. *Id.*, ¶¶36-42.

¶31    This case, however, is distinguishable for three reasons: (1) the County did not argue harmless error; (2) Chris *does* challenge the sufficiency of the evidence to support a finding of dangerousness; and (3) it is not clear from this record under which specific standard the court found Chris to be dangerous, as the court did not specify a statutory subdivision paragraph or make findings that would support dangerousness under any subdivision paragraph. *See also Outagamie County v. J.J.H.*, No. 2021AP244, unpublished slip op. ¶12 (WI App Sept. 14, 2021) (concluding that referencing language such as "recent threatening behavior" and "omissions," which are "not exclusive to a particular dangerousness standard," was insufficient to satisfy *D.J.W.*'s mandate). Further, as we discuss below, we conclude that the evidence was in fact insufficient to establish

---

[12] This lack of clarity is especially evident considering the County argues on appeal that WIS. STAT. § 51.20(1)(a)2.c. applied in the initial commitment, while the circuit court found that § 51.20(1)(a)2.b. applied in the recommitment based on identical facts.

17

dangerousness under any of the subdivision paragraphs of WIS. STAT. § 51.20(1)(a)2.

> *c. The Evidence Was Insufficient for the Circuit Court to Find Chris Dangerous under WIS. STAT. § 51.20(1)(a)2.*

¶32    We could reverse the circuit court's initial commitment order based on the ***D.J.W.*** violation alone.  However, to the extent that ***D.J.W.***'s directive could be found inapplicable to an initial commitment proceeding and for the sake of completeness, including our review of the recommitment order, we will also address Chris's challenge to the sufficiency of the evidence.  As noted above, the County argues that the court found Chris dangerous under WIS. STAT. § 51.20(1)(a)2.c.    According to the County, Ledoux's examination report specifically stated this subdivision paragraph as the basis for his opinion that Chris is dangerous, and Ledoux's testimony at the hearing was focused on the same.

¶33    Chris does not argue that the circuit court's factual findings at the initial commitment hearing were clearly erroneous.  He does, however, challenge the court's legal conclusion that its findings of fact satisfied one of the five standards of dangerousness under WIS. STAT. § 51.20(1)(a)2.  We agree.  As noted above, it is unclear from the record under which standard the court found Chris to be dangerous; therefore, we will address each of the standards below.[13]

¶34    The first standard, WIS. STAT. § 51.20(1)(a)2.a., requires proof that the individual is dangerous because he or she "[e]vidences a substantial

---

[13] We do not address the fifth standard, WIS. STAT. § 51.20(1)(a)2.e., as there are separate pleading requirements and the County did not petition to commit Chris under that dangerousness standard. *See* WIS. STAT. §§ 51.20(10)(cm), (13)(g)2d.a.

probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." Here, there was no evidence presented that Chris threatened or attempted to harm himself.

¶35 The second standard, WIS. STAT. § 51.20(1)(a)2.b., requires proof that the individual is dangerous because he or she

> [e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

Here, there was no evidence presented that Chris engaged in any recent homicidal or violent behavior, nor was there a recent overt act, attempt, or threat to do serious physical harm to others. The testimony at the hearing was that while Chris did have some weapons in his apartment, no one was aware of reports that Chris "wield[ed] any of the weapons" or that he had made any "direct threats to other people." *See* **Portage County v. E.R.R.**, No. 2020AP870-FT, unpublished slip op. ¶19 (WI App Oct. 1, 2020) (concluding that there was insufficient evidence of a threat to harm where the individual admitted that he "felt like he wanted to snap people's necks"). To the extent that Chris's actions as described at the hearing could be considered an "overt act," there was no evidence presented that the overt act was an act to do serious physical harm or "that others [were] placed in reasonable fear of violent behavior and serious physical harm to them." Sec. 51.20(1)(a)2.b.

¶36 According to the County, the third standard, WIS. STAT. § 51.20(1)(a)2.c., is the most reasonably applicable standard. This standard requires proof that the individual is dangerous because he or she "[e]vidences such

19

impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals." *Id.* Ledoux's testimony established that Chris's judgment is impaired due to his mental illness. However, impaired judgment alone is insufficient under the statute without a showing that "there is a substantial probability of physical impairment or injury to himself or herself or other individuals." *Id.* As Ledoux aptly stated, "[I]t's not illegal to be psychotic." *See D.J.W.*, 391 Wis. 2d 231, ¶57 ("A diagnosis of schizophrenia, by itself, does not demonstrate the requisite 'substantial probability of physical impairment.' If it did, the statutory elements of mental illness and dangerousness would be merely redundant.").

¶37    Here, the County argues that Chris's impaired judgment was manifested by his recent pattern of barricading his apartment complex door because he was "concerned that hitmen [and hangmen] were there to get him" and he had seen them "in his hallway outside of his door." Under these circumstances, however, where Chris was the only tenant in the apartment complex at the time, barricading the door did not create a substantial probability of serious physical harm to himself or other people. There was no evidence presented that Chris would continue to barricade the door once there were other tenants in the complex. Further, while there may be a risk that, for example, emergency personnel could not reach Chris in the event of an emergency, the same would be true if Chris had simply locked his door. In summary, there was no evidence presented that the probability of serious physical harm to Chris or others due to Chris's impaired judgment is "much more likely than not" due to his recent acts of barricading the apartment complex door. *See D.K.*, 390 Wis. 2d 50, ¶35.

¶38     The circuit court also concluded that "there are other residents who were in the process or imminently moving in and the credible concern from the court's perspective is that [Chris] would in the midst of his delusions view those individuals as potential hitmen and respond violently in response to that delusion." The court's conclusion echoed Ledoux's expressed "safety concern" that new tenants to the apartment complex would be "unknown individuals" to Chris and he would "believe that these [people] were hitmen and just having the access to weapons inside the house, [Ledoux] was concerned for [Chris's] safety as well as safety to anybody else." For several reasons, we agree with Chris that the court's conclusions in this regard were based upon mere possibility and conjecture.

¶39     First, as there were no other tenants in the apartment complex at the time of Chris's detention, there was no evidence that Chris had ever mistaken a prior tenant as a threat or threatened a tenant. Second, while the County and Ledoux stressed concern with Chris "want[ing] to obtain a firearm," the circuit court discounted that as a factor: "I don't know that I can connect that to the mental state; apparently that was a couple of weeks earlier and at least there appears to be a gap in the testimony in terms of the motivation for attempting to acquire the firearms." And third, when Chris did believe he saw "hitmen … in his hallway outside of his door" and that "they had guns with them and that they were coming to get him," the evidence presented by Huson was that Chris "called 911 and asked [police] dispatchers to run some license plates that he had seen drive by and that those were the hitmen." Thus, when Chris allegedly saw people in the hallway, he did not become violent or threatening, and he did not confront them. He sought assistance and called police. As Chris argues, he "took measures to avoid conflict, not to instigate it." Thus, the evidence was insufficient to support a finding that Chris's impaired judgment gave rise to a "substantial probability of

21

physical impairment or injury to himself or herself or other individuals." *See* WIS. STAT. § 51.20(1)(a)2.c.; *see also **D.K.***, 390 Wis. 2d 50, ¶35.

¶40 And finally, the fourth standard, WIS. STAT. § 51.20(1)(a)2.d., requires proof that the individual is dangerous because he or she

> [e]vidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness.

Again, there was no evidence presented in this case that Chris was unable to care for his basic needs as enumerated under the statute. In fact, the evidence presented was that Chris's apartment was "very clean" and "in good living condition." Further, Ledoux's examination report stated that Chris "appeared adequately groomed" and his room "was neat and presentable."

¶41 In essence, the opinions, arguments, and conclusions in this case are based entirely on Chris's "potential" for dangerousness and assertions of how Chris *might* behave dangerously in hypothetical situations without evidentiary support in the record. Our supreme court has explained that "mere possibility and conjecture are insufficient" to establish a "substantial probability" under WIS. STAT. § 51.20(1)(a)2. ***D.K.***, 390 Wis. 2d 50, ¶52. Here, the circuit court's conclusion that Chris is currently dangerous was based entirely on its concern about Chris's potential future risk, which does not satisfy any of the standards under § 51.20(1)(a)2. *See **J.W.K.***, 386 Wis. 2d 672, ¶¶17, 24; *see also **D.J.W.***, 391 Wis. 2d 231, ¶34; ***E.R.R.***, No. 2020AP870-FT, ¶21 ("[T]here was no

testimony at the evidentiary hearing that E.R.R. attempted, or will attempt, to act on his feelings or has otherwise exhibited behaviors that would suggest that he will physically harm other individuals if treatment were withdrawn."). Therefore, we conclude that the evidence was insufficient to support a finding that Chris is dangerous to himself or others at the time of his initial commitment.

## II. Recommitment

¶42     Chris also challenges the sufficiency of the evidence of dangerousness on his recommitment.[14]  The circuit court found that Chris was mentally ill, a proper subject for treatment, and "that there is a substantial likelihood, based on [Chris's] treatment record, that [he] would be a proper subject for commitment if treatment were withdrawn."  *See* WIS. STAT. § 51.20(1)(a), (am).  This time, prior to issuing a decision on Chris's recommitment, the court reviewed our supreme court's decision in *D.J.W.*, and, accordingly, it stated on the record that it was grounding Chris's recommitment on the second standard of dangerousness, § 51.20(1)(a)2.b., as viewed through the lens of § 51.20(1)(am).

¶43     Chris argues, first, that the circuit court relied on clearly erroneous findings of fact to conclude that Chris is dangerous and, second, that the evidence is insufficient to support a finding of dangerousness under WIS. STAT. § 51.20(1)(a)2.b.  The County argues that the court relied on Persing's credible testimony to determine that if treatment were withdrawn, Chris would

---

[14] The County does not argue that the appeal of Chris's recommitment order is moot because at the time of briefing and release of this decision, that order had not expired.  Although Chris's counsel alleged to this court that his recommitment order expired August 12, 2022, our review of the record suggests that the order is due to expire in September.

decompensate and return to the previous behaviors described in the initial commitment, which were dangerous to others. For the reasons that follow, we conclude that the County has failed to establish on recommitment that Chris is dangerous under § 51.20(1)(am).

¶44 First, we agree with Chris that the circuit court made several factual findings in support of its conclusion that Chris was dangerous pursuant to WIS. STAT. § 51.20(1)(am) that were clearly erroneous based on the testimony presented at the initial commitment hearing. "A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784 (citations omitted).

¶45 During the circuit court's oral ruling, it stated that Chris "felt it necessary to arm himself to ward off the threat," that "[w]hen Officer [Huson] arrived, [Chris] had armed himself with a crossbow, with knives," and that "[t]here was evidence that he had attempted to acquire a firearm from family members all for the purpose of defending himself against the imaginary hitmen or hangmen that he felt were coming to harm him."[15] As addressed above, there was no evidence presented that Chris ever wielded the weapons that he had in his apartment in general or threatened their use toward any person. There was also no statement in the record from the initial commitment that Chris was armed when Huson arrived at Chris's home. Chris was not holding any weapons, and the

---

[15] Chris does not challenge the circuit court's findings that Chris had been psychotic at the time of the emergency detention, that Chris was experiencing delusions that hangmen or hitmen were coming to get him, or that Chris had "barricaded himself in his residence."

weapons were found in different rooms of the home during a search of the apartment.

¶46    As for the firearm, Chris was attempting to seek help from the sheriff's department in retrieving his firearm from his son.  Chris stated that he needed the hunting knife that was found in a grill and the firearm "for safety,"[16] but there was no testimony presented that Chris had ever wielded those weapons against third parties or, as the circuit court suggested, that he intended to use those weapons "to ward off the threat" or "defend[] himself against the imaginary hitmen or hangmen."

¶47    Further, in its oral ruling, the circuit court discussed Chris's attempt to obtain a firearm.  The court explained that at the time of the initial commitment, the court had found that Chris's "explanation was not credible," and that "it appeared to be an action that was taken because of the delusion that people were coming to get him and that he needed the firearm and other weapons to defend himself and indicates it was a logical inference that he would be prepared to use those weapons."  Our review of the record, however, reveals that at the initial commitment hearing, the court did not state that it deemed Chris's explanation incredible—indeed, Chris did not testify at the initial commitment hearing. Instead, the court noted "a gap in the testimony in terms of the motivation for attempting to acquire the firearms," and it determined that the evidence was insufficient to show that Chris's attempt to reclaim his firearm was related to his "mental state."  In general, the court's findings of fact on recommitment suggested

---

[16] There was no indication in the record that Chris regarded the crossbow, compound bow and arrow, or hatchet as necessary for his safety.

25

that Chris had amassed an armory and was taking up arms against individuals, including law enforcement, based on his delusions. The record does not support this implication, and, accordingly, the findings of the circuit court were clearly erroneous.[17]

¶48 As to whether the facts presented at the recommitment hearing satisfy the statutory standards, we also agree with Chris that the evidence is insufficient to support a conclusion that he is dangerous under WIS. STAT. § 51.20(1)(a)2.b., as viewed through the lens of § 51.20(1)(am). The testimony at the recommitment hearing showed that Chris was doing "quite well" during his commitment and he had "returned to his previous baseline level of functioning independently, taking care of himself, et cetera." Accordingly, there was no additional testimony presented that Chris had engaged in any recent dangerous behavior. *See D.J.W.*, 391 Wis. 2d 231, ¶33. Thus, Persing's opinions and the circuit court's conclusion that Chris is dangerous "because of the significant likelihood that he would misconstrue an innocent person as the hangman or hitman and react with the weapons that he had acquired due to the delusion that he was being threatened," were based entirely on the evidence presented at the initial commitment hearing.

¶49 For the reasons noted above, we concluded that the evidence presented at the initial commitment was insufficient to support a finding that Chris

---

[17] Chris also notes that it is "troubling that the [circuit] court assumed [Chris] had hallucinated the person or persons in his hallway, when there is no evidence in the record that [Chris] has ever experienced hallucinations." We agree. It is possible that Chris did see an individual or individuals in his hallway with a gun. The fact that Chris believed them to be hitmen does not disprove the possibility that they were there.

is dangerous to himself or others. Our supreme court has explained that a finding of dangerousness under WIS. STAT. § 51.20(1)(am) must be grounded in the subdivision paragraphs of § 51.20(1)(a)2. *See D.J.W.*, 391 Wis. 2d 231, ¶41. Therefore, if "those behaviors" exhibited prior to the initial commitment do not meet the requirements under § 51.20(1)(a)2. to establish that the individual is dangerous, then the individual should not be found dangerous "based on a substantial likelihood that he [or she] *would* exhibit those [same] behaviors if treatment were withdrawn." *See J.W.K.*, 386 Wis. 2d 672, ¶23.

¶50 Here, there was no additional evidence presented at the recommitment hearing to support a finding that Chris is dangerous, aside from Persing's opinion that Chris would not take his medication if he were not on commitment and he would decompensate. According to Persing, Chris "would have [a] rather rapid return of symptoms and have concerns about being potentially harmed to the point of being a danger to the community." Persing's opinions on Chris's decompensation and the resulting dangerousness, however, were based on Chris's prior behaviors, which we deemed insufficient to establish that he is dangerous under the statute.

¶51 The County presented no evidence at either the initial commitment or the recommitment hearings that Chris engaged in any homicidal or violent behavior. *See* WIS. STAT. § 51.20(1)(a)2.b. There is also no evidence "that others are placed in reasonable fear of violent behavior and serious physical harm to them" as evidenced by an overt act, attempt, or threat to seriously harm anyone. *Id.* And, as noted above, the circuit court's dangerousness finding at the initial commitment hearing was based on speculation as to future events, rather than on evidence that the probability of serious physical harm is "much more likely than

27

not." *See **D.K.***, 390 Wis. 2d 50, ¶35. We therefore conclude that the County failed to prove by clear and convincing evidence that Chris is currently dangerous under § 51.20(1)(am) based on his behavior prior to the initial commitment. We reverse both the commitment and recommitment orders.[18]

> *By the Court.*—Orders reversed.

> This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[18] An order for involuntary medication and treatment requires the existence of a valid commitment order. *See* WIS. STAT. § 51.61(1)(g)3. Our reversal of the commitment and recommitment orders then also mandates the reversal of the orders for involuntary medication and treatment because a medication order is tied to the existence of a final commitment order.